IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) <br> **KELLY ANCAR,** ) <br> ) <br> **Plaintiff/Relator,** ) <br> ) <br> **-v-** ) <br> ) <br> **THE EVANGELICAL LUTHERAN GOOD** ) <br> **SAMARITAN SOCIETY and JOHN DOE** ) <br> **INDIVIDUALS OR ENTITIES 1–10,** ) <br> ) <br> **Defendants.** | **Case No.** 4:24-cv-4172 <br> <br> **COMPLAINT AND JURY DEMAND** <br> <br> **TO BE FILED UNDER SEAL** <br> **PURSUANT TO 31 U.S.C. § 3730(b)(2)** |

Plaintiff-Relator Kelly Ancar ("Relator" or "Ms. Ancar"), by and through the undersigned

counsel, and on behalf of the United States of America ("United States") hereby alleges as follows:

## I.    INTRODUCTION

1.      This is a *qui tam* action, brought by Ms. Ancar on her own behalf and on behalf of

the United States, against The Evangelical Lutheran Good Samaritan Society ("Good Samaritan")

and its owners, (John Doe Individuals or Entities 1-10) (all defendants together, "Defendants") for

using, making, presenting, and causing to make, use, or present false claims to the United States

in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "False Claims Act").

2.      Ms. Ancar, RN-BSN,[1] has a Class A/C (Skilled Services and or HCBS) license to

provide home health services and is the owner of Amazing Grace Homecare.  Ms. Ancar has been

recognized in the Fifth Circuit Court of Appeals in New Orleans, Louisiana as an expert witness

in the Medicare Compliance Survey Process in *New Orleans Home for Incurables, Inc. v. Bruce*

*D Greenstein, Secretary of Louisiana Department of Health and Hospitals.*  From 2010 to 2016,

---

[1] Ms. Ancar previously held MDS-CT and C-DON certifications.

1

Ms. Ancar also did private consulting, completing hundreds of Medicare compliance audits throughout eleven different states. During those years, Ms. Ancar audited several Good Samaritan locations while consulting in facilities in Arkansas, Florida, Ohio, Kansas, Nebraska, Colorado, Tennessee, Texas, and West Virginia.

3.      Good Samaritan is "the largest not-for-profit provider of senior care and services in the United States."[2] Good Samaritan's business model targets seniors who are participating in Original Medicare (Part A and Part B) or a Medicare Advantage Program (Part C).[3]

4.      Good Samaritan's lines of business generally include home health, skilled rehabilitation, assisted living, and senior living.[4]

5.      Good Samaritan has a national presence.[5]

6.      Good Samaritan describes one of its service lines as follows: "Our home health services focus on the medical assistance you need including medication management,

---

[2] Quote from Google search results showing text from Good Samaritan's LinkedIn page (last visited September 17, 2024).

[3] *See* https://www.good-sam.com/resources/what-is-medicare (last visited September 17, 2024).

[4] https://www.good-sam.com/-/media/project/good-sam/about/files/2018-annual-report.pdf (last visited September 17, 2024).

[5] *See* https://www.good-sam.com/locations (last visited September 17, 2024). Good Samaritan states that it operates in Florida, Tennessee, Wisconsin, Illinois, Minnesota, Iowa, Arkansas, North Dakota, South Dakota, Nebraska, Kansas, Texas, Colorado, New Mexico, Arizona, Oregon, and Hawaii. *See* https://www.good-sam.com/locations (last visited September 17, 2024). Good Samaritan listed additional states in its 2018 annual report: West Virginia, Ohio, Kentucky, Indiana, Montana, Idaho, and Washington. *See* https://www.good-sam.com/-/media/project/good-sam/about/files/2018-annual-report.pdf (last visited September 17, 2024). Good Samaritan identifies the following states as providing Home Health services: Wisconsin, Minnesota, Iowa, North Dakota, South Dakota, Nebraska, Kansas, Colorado, and Arizona. *See* https://www.good-sam.com/locations (services described by clicking on each state) (last visited September 17, 2024). Upon information and belief, Good Samaritan planned to withdraw from several states. *See* https://siouxfalls.business/good-samaritan-plans-to-exit-15-states-focus-on-7/ (last visited September 17, 2024). The states in which Good Samaritan operates, including states in which Good Samaritan provides Home Health services, may be different than listed in this Complaint.

rehabilitation services, wound care, social work and other medical treatments."[6] Good Samaritan's home health services are hereinafter referred to as "Home Heath."

7.      The fraud alleged herein is straightforward.  Good Samaritan has implemented various schemes in order to maximize Medicare reimbursements.

8.      In particular, and as more fully outlined herein (*see infra* Section VI), Good Samaritan has defrauded the United States by:

(a)    admitting patients in Home Health who do not qualify including for skilled nursing and skilled therapy services;

(b)    manipulating diagnoses codes/documentation of patients to allow them to appear qualified or to extend the admissions in Home Health; and

(c)    extending the admission of patients in Home Health by failing to discharge the patients upon attainment of prior level of function, refusals, or inability to reach goals.[7]

9.      As part of Good Samaritan's scheme, Good Samaritan misled medical providers, beneficiaries, and families, including powers of attorney, regarding current assessment, reasonable goals, and accurate prior level of function of patients.

10.     The identified fraudulent conduct has been consistent and ongoing since at least 2010.

11.     Federal law explicitly prohibits healthcare providers (such as Good Samaritan)

---

[6] https://www.good-sam.com/services/home-based-services (last visited September 17, 2024).

[7] Good Samaritan may be engaging in other unlawful conduct, such as illegal kickbacks in violation of the Medicare and Medicaid Patient Protection Act a/k/a the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b ("AKS") that lead to false claims being submitted to the United States. Ms. Ancar's knowledge is specific to Good Samaritan's Home Health services including patients' admissions to Home Health from Good Samaritan's skilled nursing and skilled therapy facilities where patients with dementia were receiving skilled services.  Good Samaritan may be engaging in similar conduct of providing services to patients who cannot benefit from the skilled nursing and skilled therapy services and manipulating coding/documentation to allow the patients to appear qualified for admission to hospitals, skilled therapy facilities, or other locations.

Good Samaritan may be billing the United States for visits not made by patients if Good Samaritan is performing Electronic Visit Verification.

from engaging in this conduct for Medicare beneficiaries to receive healthcare services payable by a federal healthcare program. *E.g.,* 31 U.S.C. § 3729, *et seq.* (The False Claims Act).

12.    Good Samaritan is well-aware of these explicit prohibitions as a result of its willingness to participate in federally funded healthcare programs that set such prohibitions as a precondition to participation in the programs.

13.    Despite these clear prohibitions, Good Samaritan nevertheless knowingly and purposefully implemented the fraudulent practices alleged herein, designed to target, induce, and exploit vulnerable Medicare beneficiaries (many of whom are elderly, disabled, and low-income)—all to illegally increase patient admissions to Home Health with Good Samaritan at the expense of the United States.

14.    Ms. Ancar, being professionally familiar with various mechanisms used to commit fraud found in Good Samaritan audits in past years, discovered the ongoing fraud with her clients who were enrolled with Good Samaritan over the past year and is aware of and recognized the fraudulent conduct based on her prior audit work as well.

15.    Upon information and belief, the fraudulent schemes are orchestrated at the corporate level and at the regional directors' level to meet quotas (census to meet budgets), include participation from outsourced therapy companies, and then trickled down to the nurses under pressure from the Corporate Interdisciplinary Team to facilitate ongoing skilled nursing and skilled therapy services.

16.    Upon information and belief, Good Samaritan's Home Health agencies are not likely to complete their own Medicare billing, and, instead, billing would typically be done by corporate level offices or outsourced to third party billing companies. However, before being submitted to billing, each claim at Good Samaritan undergoes a corporate triple check process and

multiple internal reviews, which is presented to the United States as a guard against non-compliance. This process goes through all levels of nursing, therapy, administration, regional corporate compliance staff, and Good Samaritan corporate staff.

17.     The damages incurred by the United States as a result of Good Samaritan's fraudulent scheme are substantial. Because Good Samaritan improperly admitted patients in services that are reimbursed by Medicare described herein, all services and care provided to those patients are tainted and not lawfully payable by the United States. Therefore, a significant portion of Good Samaritan's Medicare revenue from 2010 to the present is tainted as a result of the illegal schemes. For reference, Good Samaritan's estimated annual revenue was $1 billion in 2018.[8] Good Samaritan's estimated annual revenue was $1.04 billion in 2022.[9] Much of this revenue is at issue in this False Claims Act case. Upon information and belief, the fraud continues still today—and will no doubt continue to grow in scope as Good Samaritan continues to grow and open more Home Health agencies and new centers throughout the country.

18.     The target market shows increasing numbers of Medicare beneficiaries with dementia, as well. An estimated $164 billion will be spent by the federal government under Medicare in 2024 caring for those with Alzheimer's and other dementias, being 64% of the total estimated Medicare costs.[10] These costs to Medicare include reimbursement for home health services and therapy services provided to patients with dementias who cannot likely benefit from the services.

19.     Under the terms of the False Claims Act, this *qui tam* Complaint is to be filed *in*

---

[8] *See* https://www.good-sam.com/-/media/project/good-sam/about/files/2018-annual-report.pdf / (last visited September 17, 2024).
[9] *See* https://projects.propublica.org/nonprofits/organizations/450228055 (last visited September 17, 2024).
[10] *See* https://portal.alzimpact.org/media/serve/id/62509c7a54845 (last visited September 17, 2024).

*camera* and under seal and is to remain under seal for a period of at least sixty (60) days and shall not be served on Defendants until the Court so orders.   The United States may elect to intervene and proceed with the action within the 60-day time frame, or within any extensions of that initial sixty-day period granted by the Court for good cause shown, after it receives both the Complaint and the material evidence submitted to it.

## II.    NATURE OF THE ACTION

20.    This is an action to recover treble damages and civil penalties arising from the fraudulent conduct of Defendants for using, making, presenting, and causing to make, use, or present false statements and claims to the United States in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

21.    Under the False Claims Act, a private person may bring an action in federal district court for itself and for the United States, and may share in any recovery.   31 U.S.C. § 3730(b). That private person is known as a "Relator" and the action that the Relator brings is called a *qui tam* action.

## III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction to adjudicate this action under 28 U.S.C. §§ 1331, 1345.

23.    This Court has personal jurisdiction over Good Samaritan pursuant to 31 U.S.C. § 3732(a) because Good Samaritan transacts business in the State of South Dakota and in this District.

24.    Venue is proper in this District under 31 U.S.C. § 3732 and 28 U.S.C. § 1391(b) and (c) because Good Samaritan can be found and transacts business in this District.

## IV.    THE PARTIES

25.     Ms. Ancar brings this action on behalf of the United States, including its agency, the Department of Health and Human Services ("HHS"), its component, the Centers for Medicare & Medicaid Services ("CMS," formerly the Health Care Financing Administration ("HCFA")), and all other government healthcare programs, such as Medicaid, TRICARE/CHAMPUS, Blue Cross/Blue Shield – CHIP, and Veterans Administration ("VA") and all other government programs, including Medicaid, Medicare Part B, and Medicare Part C (Medicare Advantage), (collectively, "Medicare").

26.     Ms. Ancar also brings this action on behalf of herself, as permitted under the False Claims Act.  Ms. Ancar is a Kansas resident who discovered the fraud by auditing Good Samaritan locations in the past and by working with her patients who were enrolled at Good Samaritan in the past year.  Ms. Ancar has direct and independent knowledge of the information on which the allegations set forth in this Complaint are based, is the original source of these allegations, and has knowledge of the false claims and records that Good Samaritan knowingly, falsely, and fraudulently submitted to the United States as alleged herein.

27.     The Evangelical Lutheran Good Samaritan Society is a 501(c)(3) public charity formed in North Dakota in 1922.  Good Samaritan's principal place of business is located at 4800 West 57th Street, Sioux Falls, South Dakotah 57108.

28.     Upon information and belief, John Doe Individuals and Entities 1–10 are various legal entities or the owners of Good Samaritan, the names and address of which are unknown at this time.  Relator reserves the right to amend the Complaint to identify additional John Doe Individuals or Entities that are discovered.

## V.     LEGAL FRAMEWORK

### A.     The False Claims Act

29.    The False Claims Act imposes civil liability upon any person who:

a.    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

b.    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

. . . .

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a).  The Affordable Care Act requires a person who has received an overpayment from the Unites States to report and return the overpayment within 60 days of identification, or the date that any corresponding cost report is due; and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G).  *See* 42 U.S.C. § 1320a-7k(d).

30.    For purposes of the FCA

(1)    the terms "knowing" and "knowingly"

(A)    mean that a person, with respect to information – (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information; and

(B)    require no proof of specific intent to defraud.  31 U.S.C. § 3729(b).

31.    Effective November 2, 2015 (the date of enactment of the Federal Civil Penalties Inflation Adjustment Act, Improvements Act of 2011, Public Law 114-74, sec. 701 ("2015 Amendments")), the penalties increased from a minimum-maximum per-claim penalty of $5,500 and $11,000 to $10,781 and $21,563.  The increased amounts apply to civil penalties assessed for violations occurring after November 2, 2015.  Violations that occurred on or before November 2,

8

2015 are subject to the previous penalty amounts. On February 3, 2016, pursuant to the 2015 Amendments annual re-indexing of the FCA penalties for inflation, the civil penalties again increased to a minimum-maximum per-claim penalty of $10,957 and $21,916. On January 19, 2018, the FCA penalties were again increased to a minimum-maximum per-claim penalty of $11,181 and $22,363. In February 2019, the amounts were increased again to $11,463 and $22,927. 84 Fed. Reg. 2445, 2446 (Feb. 7, 2019). In 2020, these amounts were again increased to $11,665 and $23,331. 15 C.F.R. § 6.3 (2020); 85 Fed. Reg. 207, 208 (Jan. 3, 2020). In 2021, these amounts were again increased to the amounts of $11,803 and $ 23,607. 86 Fed. Reg. 2005 (Jan. 6, 2021). In 2022 these amounts were again increased to the amounts of $12,537 and $25,076. 81 Fed. Reg. 2187 (Jan. 13, 2022). In 2023, these amounts were again increased to the current amounts of $13,508 and $27,018 per claim. 88 Fed. Reg. 5776 (Jan. 30, 2023).

### B.    The Medicare Program

32.    The Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program, was created in 1965 as part of the Social Security Act to pay the costs of certain healthcare services for eligible individuals. The Secretary of Health and Human Services ("HHS"), an agency of the United States whose activities, operations, and contracts are paid from federal funds, administers the Medicare program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

33.    Medicare is a 100% federally subsidized health insurance system for eligible Americans, including those aged 65 and older, certain disabled people, and certain people with chronic diseases who elect coverage. 42 U.S.C. § 1395c; *see* 42 U.S.C. §§ 1395j-1395w. To participate in Medicare, a provider must sign and file a Provider Agreement with CMS promising compliance with applicable statutes, regulations, and guidance. 42 U.S.C. § 1395cc; 42 C.F.R.

§ 412.23(e)(1). Medicare service providers have a legal duty to familiarize themselves with Medicare's reimbursement rules, including those delineated in the Medicare Manuals. *Heckler v. Coty. Health Serv. of Crawford Co., Inc.,* 467 U.S. 51, 64–65 (1984).

34. By participating in the Medicare program, Good Samaritan is charged with actual notice and knowledge of the federal and state statutes, regulations, and rules applicable to the Medicare program, and has consented to compliance with all such statutes, regulations, and rules, including those governing reimbursement.

**C.     Home Health**

35. As part of its coverage, Medicare pays for some "home health services" for qualified patients.

36. To qualify for home healthcare reimbursement under Medicare, a patient must: (1) be homebound- i.e., the patient is generally confined to her home and can leave only by considerable effort; (2) need part-time skilled nursing services or speech therapy, physical therapy, or continuing occupational therapy as determined by a physician; and (3) be under a plan of care established and periodically reviewed by a physician and administered by a qualified home health agency (HHA). *See* 42 U.S.C. §§1395f; 1395x(o).

37. When a patient so qualifies, Medicare will pay for: (1) part-time skilled nursing care; (2) physical, occupational, or speech therapy; (3) medical social services (counseling); (4) part-time home health aide services; and (5) medical equipment and supplies. *Id.*

38. "Beginning on January 1[,] 2020, HHAs are paid a national, standardized 30-day period payment rate if a period of care meets a certain threshold of home health visits. This payment rate is adjusted for case-mix and geographic differences in wages. 30-day periods of care that do not meet the visit threshold are paid a per-visit payment rate for the discipline providing

care."[11]

39.     Prior payments by Medicare for home healthcare were by way of a Prospective

Payment System (PPS). *See* 42 U.S.C. § 1395fff; 42 C.F.R. § 484.  The PPS is based on factors

such as changes in the number of visits in an episode, the mix of services in an episode, the level

of intensity of services in an episode, the average cost of providing care per episode. *Id.*

40.     A patient is placed in a diagnostic group based upon the patient's comprehensive

initial assessment by the HHA. 42 C.F.R. § 484.55.  Upon a physician's referral, an HHA is

required to make an initial assessment visit and perform a comprehensive assessment

encompassing the patient's clinical, functional, and service characteristics. *Id.*

41.     Accordingly, a registered nurse or therapist must evaluate the patient's eligibility

for Medicare home healthcare, including homebound status, and must determine the patient's care

needs using the Outcome and Assessment Information Set (OASIS). *Id.*

42.     The OASIS diagnostic items describe the patient's observable medical condition

(clinical), physical capabilities (functional), and expected therapeutic needs (service).  Based upon

the OASIS information - and in turn upon the expected cost of caring for the patient – the patient's

"case mix assignment" is determined and the patient is assigned to one of eighty Home Health

Resource Groups (HHRGs).

43.     The patient's HHRG assignment and other OASIS information are represented by

a Health Insurance Good Prospective Payment System (HIPPS) code that is used by Medicare to

determine the rate of payment to the HHA for a given patient.

44.     Once the HAA has submitted the patient's OASIS information, partial payment is

---

[11] *See* https://www.cms.gov/medicare/payment/prospective-payment-systems/home-health (last
visited September 17, 2024).

made by CMS based on a presumptive 60-day episode.  42 C.F.R. § 484.205.

45.     The initial base rate may be subject to upward adjustment, such as where there is a "significant change in condition resulting in a new case-mix assignment," or downward adjustment, such as where the number of predicted therapy visits substantially exceeds the number actually performed.  42 C.F.R. § 484.205.  Throughout the patient's episode, the HHA is required to maintain clinical notes documenting the patient's condition, health services performed, and continued need for skilled care.  *See* 42 U.S.C. 1395x(o); 42 C.F.R. § 484.84.

46.     In order to continue receiving covered care for another 60-day episode, the patient must be re-assessed by the HHA within the final five days of the initial episode and be recertified by a physician as requiring and qualifying for home healthcare.  42 C.F.R. § 484.205.

47.     If, for any reason, the HHA provides four or fewer visits during a patient's home health episode, the episode is subject to a "low utilization payment adjustment" (LUPA).  42 C.F.R. § 484.230.  Rather than being entitled to the full prospective payment amount, the HHA will be entitled to payment on a per-visit basis.  *Id.*  Accordingly, the HHA may be obligated to repay amounts already received as a prospective payment.

48.     Medicare will not pay for home health services provided to patients unless those patients are homebound and require intermittent skilled nursing care or skilled therapy.  *See* 42 U.S.C. §1395f.  It is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary.  *See* 42 U.S.C. §1395y(a)(l)(A).  Medicare providers may not bill the United States for medically unnecessary services or for procedures performed solely to generate profit of the provider.  *Id.*

49.     To enroll as a Medicare provider, the provider was required to submit a Medicare Enrollment Application for Institutional Providers.  *See* CMS Form 855A.  In submitting Form

12

855A, Defendant made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal AntiKickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

### D.    Skilled Nursing and Skilled Therapy Services

50.    To be eligible for home health services, one of the requirements is that a patient must require skilled nursing services or skilled therapy services. *See* 42 C.F.R. § 424.22.

51.    To be considered a skilled service, the service must be so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel. *See* Medicare Benefit Policy Manual Ch. 7; §40.1.

52.    Skilled nursing services are covered when an individualized assessment of the patient's clinical condition demonstrates that the specialized judgment, knowledge, and skills of a registered nurse or, in certain instances, a licensed practical nurse are necessary. Accordingly, the services of a home health aide do not qualify as skilled nursing services.[12] Further, coverage of skilled nursing care does not turn on the presence or absence of a patient's potential for improvement from the nursing care, but rather on the patient's need for skilled care. Medicare Benefit Policy Manual Ch. 7 § 40.1.

---

[12] Home Health Aide Services are covered under the Medicare Home Health Benefit when the services are reasonable and necessary to the treatment of the patient's illness or injury, among other requirements. Covered home health aide services include "personal care" which is defined in part as bathing, dressing, caring for hair, nail and oral hygiene needed to facilitate treatment or to prevent deterioration of patient health, feeding, assistance with elimination (including routine catheter care), assistance with ambulation, changing position in bed and assistance with transfers. See Medicare Benefit Policy Manual Ch. 7 § 50.2.

53.     When, however, the individualized assessment does not demonstrate such a necessity for skilled care, including when the services needed do not require skilled nursing care because they could safely and effectively be performed by the patient or unskilled caregivers, such services will not be covered under the home health services.  Medicare Benefit Policy Manual Ch. 7 § 40.1.1.

54.     Home health services also cover Skilled Therapy Services.  42 C.F.R. §424.22.  To be covered as skilled therapy, however, the services must require the skills of a qualified therapist and must be reasonable and necessary for the treatment of the patient's illness or injury. Again, coverage does not turn on the presence or absence of an individual's potential for improvement, but rather on the beneficiary's need for skilled care.

55.     Assuming all other eligibility and coverage criteria have been met, the skilled therapy services must be reasonable and necessary to the treatment of the patient's illness or injury within the context of the patient's unique medical condition.  To be considered reasonable and necessary for the treatment of the illness or injury: (a) The services must be consistent with the nature and severity of the illness or injury, the patient's particular medical needs, including the requirement that the amount, frequency, and duration of the services must be reasonable; and (b) The services must be considered, under accepted standards of medical practice, to be specific, safe, and effective treatment for the patient's condition. The home health record must specify the purpose of the skilled service provided.  Medicare Benefit Policy Manual Chapter 7; §40.2.1.

## VI.     FACTUAL ALLEGATIONS

56.     Good Samaritan has implemented illegal schemes in order to increase admissions in its Home Health services of Medicare beneficiaries—resulting in the United States paying for healthcare services that are tainted by these schemes.

57.     In particular, and as more fully outlined below, Good Samaritan has defrauded the United States by:

(a)     admitting patients in Home Health who do not qualify including for skilled nursing and skilled therapy services;

(b)     manipulating diagnoses codes/documentation of patients to allow them to appear qualified or to extend the admission in Home Health; and

(c)     extending the admission of patients in Home Health by failing to discharge the patients upon attainment of prior level of function, refusals, or inability to reach goals.

58.     As part of Good Samaritan's scheme, Good Samaritan misled medical providers, beneficiaries, and families, including powers of attorney, regarding current assessment, reasonable goals, and accurate prior level of function of patients.

59.     The identified fraudulent conduct has been consistent and ongoing since at least 2010.

60.     Good Samaritan knowingly and purposefully implemented these fraudulent practices so as to target, induce, and exploit vulnerable elderly Medicare beneficiaries (many of whom are disabled and low-income)—all to illegally increase admissions at in its Home Health services or increase reimbursements at the expense of the United States.

### A.     Good Samaritan Fraudulently Admitted Patients who do not Qualify for Home Health including for Skilled Nursing and Skilled Therapy

61.     Since at least 2010, Good Samaritan in an effort to increase admissions of patients in skilled nursing and skilled therapy through its Home Health services, has engaged in a pattern and practice of fraudulently admitting patients who do not meet patient qualifications for Home Health for its skilled nursing and skilled therapy and who should be referred for a lower level of care to include services safely performed by Home Health Aides, CNAs, and Restorative Nursing Aides.

62. Good Samaritan improperly admits patients with dementia and other cognitive diagnoses to therapy services that require the ability to retain and follow safety cues in order to reach therapy goals. A therapy candidate with a diagnosis and ongoing treatment for dementia would require review of short-term memory loss, which may likely render a patient incapable of retaining the cues and training in a meaningful or useful way. Behaviors that would interfere with therapy services must be reviewed prior to admission for therapy services to justify setting goals as reasonable and attainable. Documentation of the level of short-term memory loss, as well as interviews with family and caregivers must be part of any pre-admission screening to ensure an appropriate and proper admission.

63. Upon information and belief, Good Samaritan ignores red flag, or acts intentionally, in admitting patients to its Home Health services, such as patient use of medications for moderate to severe dementia, use of medications for severe anxiety that interferes with the completion of activities of daily living, Hospice referrals during and after qualifying hospital stays, extreme patient behaviors that interfere with therapy services and activities of daily living, and incidence of refusals of therapy services as inpatient during and after the qualifying hospital stay. Good Samaritan fails to accurately identify symptoms that would be treated by speech therapy, and ignores referrals indicated for speech therapy in patients with cognitive deficits while on physical therapy and occupational therapy services, who have clear indicators of swallowing problems. Speech therapists are designated by Medicare to claim reimbursement for cognitive testing as well as treating swallowing problems. Making an appropriate referral for speech therapy on a physical or occupational therapy patient would by default expose the cognitive deficits of a dementia patient (during the speech therapy evaluation) that would ultimately trigger a discharge from therapy services.

64.     Each office is responsible for completing accurate OASIS-E, which results in the initial coding.  The CPT codes for therapy services would be generated by the medical records system.  Upon information and belief, all of Good Samaritan's Home Health agencies are showing the same audit flags for these patients because all of the Home Health agencies are using the same ICD-10 and CPT software for therapy coding and documentation.

65.     Upon information and belief, Good Samaritan is hiding the cognitive decline of patients in order to circumvent the Medicare requirement that the beneficiary must be able to benefit from the services provided.  If the patient cannot retain the safety or functional cues provided, being so complex as to require the skills of a physical or occupational therapist, then there is no potential for measurable benefit.  An example of a type of improper admission of patients is any non-weight bearing dementia patients meeting Hospice criteria while receiving therapy services.

66.     Patient A is an example of Good Samaritan's misconduct in 2024.[13]  Patient A is Ms. Ancar's client in Kansas, who had a recent hip fracture that could not be repaired, and who had orders from the orthopedic surgeon to be completely non-weight bearing on the fractured side for a period of time until an x-ray shows healing and progress toward weight bearing.  Ms. Ancar put in place a plan of care that included a mechanical lift for transfers because of Patient A's severe short-term memory loss and inability to ensure that she could stand without putting weight on the injured side.  The Good Samaritan nurse instructed Ms. Ancar's staff that it was okay to transfer Patient A without the lift because the physical therapist said Patient A followed cues during the one time evaluation, and "needed to keep the other leg strong," with no regard to the patient's non-compliance, safety, severe short-term memory loss, medical records, use of medications that were ordered for treatment of moderate to severe dementia symptoms, behaviors that required Ativan

---

[13] Personal identifiable information for patients identified in this Complaint have been withheld. Relator will provide information upon request.

use twice a day to manage, and previous refusals of therapy services including during the qualifying hospital stay, previous admissions of Patient A with the same mental status as the current admission, safety of the caregivers, refusal of cares, refusal to follow cues over the 3.5-year period that Ms. Ancar's staff had cared for Patient A up to 24 hours a day.[14] The Good Samaritan nurse told Ms. Ancar's staff that they were able to transfer Patient A without a lift if they felt comfortable, and to not report the transfers to Ms. Ancar since Ms. Ancar was care planning the use of the mechanical lift despite the plan of care from Good Samaritan.

67.     Good Samaritan also pressured Ms. Ancar's staff and Patient A's family, orally and in writing, to stop using the mechanical lift for transfers because it would cause physical therapy to discharge without regard for the requirement for the full lift in order to ensure no weight bearing would further injure the fractured bone as ordered by the orthopedic surgeon. The Good Samaritan nurse and administrator had several phone conferences and text message conversations with Ms. Ancar to try to pressure her to stop using the lift so physical therapy could keep Patient A on service.

68.     Good Samaritan misled the primary care physician to obtain an order to discontinue the lift in order to continue therapy services. A Good Samaritan Home Health nurse wrote a text to Ms. Ancar that she could not use the lift in the plan of care and that she "doubted if anyone would really get hurt because [Patient A] only weighs 90lbs." Good Samaritan attempted to mislead the orthopedic surgeon in a written note indicating that Patient A was capable of following cues to maintain non-weight bearing status on the fractured side (based on a single ten minute physical therapy evaluation and without regard to all other listed information to the contrary) while

---

[14] For example, on a homecare review form on January 1, 2020, the patient was marked "not oriented to" time and situation. Not being oriented to situation shows severe short term memory loss and would mean that Patient A was not capable of interpreting and retaining safety cues from a therapist.

withholding that information from the orthopedic surgeon. Good Samaritan obtained an order to discontinue use of the mechanical lift from the primary care provider while the orthopedic surgeon upheld its use in writing and via a phone call from the nurse. After Ms. Ancar constant refusal to discontinue the use of the full mechanical lift to ensure that the fractured healing bone would be protected from weight bearing (because Patient A could not remember to not put any weight on the injured limb) and the orthopedic surgeon refused to discontinue recommendations for using a mechanical lift, Good Samaritan discharged the patient after approximately five weeks of therapy services post fracture.

69.    Ms. Ancar made a complaint to the administrator and had a phone conference with the administrator and a nurse.

70.    Good Samaritan discharged Patient A because, upon information and belief, with the Good Samaritan nurse stating to the family and to Ms. Ancar's staff that "it was a liability to have Patient on service since you are using the mechanical lift."

71.    The note written in a physician's orders from June 22, 2021, also show Good Samaritan's misconduct in that no exercises were listed by the provider that required the skills of a physical therapist, and Good Samaritan gave Patient A a diagnosis of severe heart failure with reduced EF 20% and Global Hypokinesis of heart, which would be considered a qualifying factor in a Hospice admission due to being life limiting by definition. Despite this diagnosis and a written list of exercises clearly designed to be performed with the assistance of a caregiver (not a therapist) as all other factors, Good Samaritan qualified the patient for physical therapy and so it was ordered. The diagnosis listed on the order would potentially qualify Patient A for Hospice services which would disqualify Patient A for therapy services.

72.    The notes on a physician's orders from July 8, 2022, also show Good Samaritan's

misconduct. The note describes Patient A's behavior such as stomping her feet and pounding on the table. These notes are important because they show a progressive trend toward cognitive decline and behaviors that would prohibit any benefit from therapy services. Good Samaritan would be required to request and to consider records or access records when determining prior level of function, appropriate services, and goal setting.

73.    The records from Patient A's stay at a hospital around December 7, 2021, show Good Samaritan's misconduct that Patient A should not be enrolled in physical therapy. The question regarding if the client was agreeable to therapy services and if the client is able to participate in the goals set by therapy were both answered "yes," however the documentation on the same page written by the same therapist who marked "yes" does not support the answers as marked. These two fields on this form are automatically audited if answered "no." If it is answered "no," then the patient must be discharged from therapy. Answering "yes" to these fields when that is not supported by the other documentation in the evaluation is improper and misleading. In fact, for Patient A the inpatient therapy notes contradicted the answer to the two fields, which would result in an overpayment determination, and, yet, Good Samaritan continued with therapy services.

74.    The physician's orders from April 11, 2023, also show Good Samaritan's misconduct. The Order describes Patient A as being discharged in stable condition, progressing back to "baseline mental status" and "uses cane/walker." This is important because documentation upon discharge shows Patient A's current level of function to be ambulating with a cane/walker which is at the same level as Patient A's prior level of function. This standard requirement to establish reasonable goals to support the need for therapy services cannot be met because the prior level of function has already been achieved. Care records show the requirement for cues and supervision 24/7 to ensure use of the cane/walker due to cognitive decline and severe short-term

memory loss, which would further indicate that therapy services were not proper.

75.     The reason the speech therapist evaluations are important is that Good Samaritan ignored obvious, multiple diagnoses and notes that would support a speech therapy evaluation, but Good Samaritan did not pursue it. In fact, without interventions determined by a speech therapist, Patient A's condition was at risk of worsening. Assessment from a speech therapist would include a cognitive assessment by default and would completely undermine support for physical therapy services, showing that Patient A is not capable of retaining the cues from a therapist, and, therefore unable to benefit from therapy services. Good Samaritan is well aware of this outcome of a speech therapist evaluation on a patient with dementia.

76.     The discharge records for Patient B in Kansas from April 24, 2024, also show Good Samaritan's misconduct. The discharge documentation shows that a Hospice consultation was requested by the hospitalist, the family, and Patient B while hospitalized due to qualifying criteria and rapid decline in condition. In addition, the physician ordered Roxanol (morphine) which is typically used as part of a Hospice protocol. The family for Patient B told Ms. Ancar's nurse that Patient B had been admitted to Hospice services after discharge to home. Two days later, Good Samaritan admitted Patient B for therapy services, and the family stated that they were still discussing options with Hospice, that it "would probably be next week after therapy is done." Patient B has heart failure and severe chronic back pain, history of cerebral vascular accident, anxiety, and depression. A referral was made to occupational therapy for edema management, due to severe swelling in Patient B's feet and ankles. The Good Samaritan nurse told Ms. Ancar's staff that they could "just wrap [Patient B's] legs in the ACE wraps" to reduce the swelling. Ms. Ancar instructed her staff that they were not to perform that skilled service because it was outside their scope of practice and requested that an occupational therapist measure the patient for properly

fitting compression stockings. The occupational therapist measured Patient B and recommended that Patient B be seen by cardiologist as soon as possible due to the edema and signs of worsening heart failure. The Good Samaritan nurse told Patient B's family that Ms. Ancar's staff was refusing to wrap the patient's legs, but that "they could do it." A family member of Patient B put on zippered compression stockings that were too small for 30 minutes. The edema was reduced, however the fluid returned out of the tissues over such a short period of time without the benefit of diuresis to prevent fluid overload which resulted in an emergency room visit and re-admission to the hospital for exacerbation of congestive heart failure. After returning home, Good Samaritan abruptly discharged the patient from services with very little notice to Patient B's family and with no goal attainment during services. The Hospice referral has resumed as before.

77.     The conduct that Ms. Ancar observed in the past year is consistent with conduct that Ms. Ancar observed while auditing Good Samaritan locations around the country for many years. Based on Ms. Ancar's observations during the audits of Good Samaritan locations around the country and based on her years of auditing experience, Ms. Ancar believes that the fraudulent conduct is nationwide and has continued for years.

78.     Good Samaritan's improper admission of patients into its Home Health services constitutes a violation of the False Claims Act. Good Samaritan's unlawful admissions tainted all services and care provided to the patients.  By billing and/or receiving money from the United Sates for providing care to those patients, Good Samaritan has violated the False Claims Act.

**B.     Good Samaritan Fraudulently Manipulated Diagnoses Codes/Documentation for Patients to Obtain Medicare Reimbursements or Higher Medicare Reimbursements**

79.     Since at least 2010, Good Samaritan has engaged in a pattern and practice of knowingly, falsely, and fraudulently manipulating patients' diagnoses codes/documents to obtain

reimbursements or higher reimbursements from Medicare.

80.    Medicare providers, such as Good Samaritan, are required to list each diagnosis and corresponding ICD-10-CM code at the level of highest specificity for which the patient is receiving medical care. Each diagnosis and corresponding ICD-10-CM code is sequenced according to the patient's diagnosis.

81.    Records show for Patient A and Patient B that documentation for a patient contradicts the coding for the patient.

82.    As explained for Patient A, on a homecare review form on January 1, 2020, the patient was marked "not oriented to" time and situation. Not being oriented to situation shows severe short-term memory loss and would mean that Patient A was not capable of interpreting and retaining safety cues from a therapist. Records for Patient A showed information that should have been coded. Good Samaritan did not code for, or manipulated documents to exclude, severity of short-term memory loss, confusion, anxiety, behaviors, PRN, and scheduled pharmaceutical interventions, complicating co-morbidities, Hospice criteria met.

83.    The records from Patient A's stay at a hospital around December 7, 2021, show Good Samaritan manipulated coding or documents in order to have Patient A enrolled in Home Health services. The records show that Patient A needed max encouragement to walk in physical therapy. Patient A continuously said that the physical therapy is not necessary. Patient A stated "I need time to recover and doing better before I see you." Nevertheless, Good Samaritan enrolled Patient A in Home Health services stating that rehabilitation potential is "good." Physical therapy services would not be appropriate due to refusals and resistance to services. Medicare allows only three refusals of service before the patient must be discharged. It is a contradiction to state that rehabilitation potential is "good" when the patient is clearly refusing therapy services. The

rehabilitation potential should have been listed as "unable to assess due to refusals."

84.    The next day for Patient A, on December 8, 2021, despite refusals of education to use a cane, refusal of therapy services, and stating "I don't want to walk," the discharge plan shows "yes" to "agreeable" and "able to assist with." Good Samaritan is well aware that if either of these two questions are answered with "no," then the claim will require review for discharge.

85.    Records show that Good Samaritan provided misleading documentation to physicians, which upon information and belief, were to obtain orders to remove indicators for discharging patients from Home Health services. As example is from Patient A, described above, when Good Samaritan misled the orthopedic surgeon by telling the orthopedic surgeon that Patient A was capable of following cues based on a single physical therapy evaluation and withholding all other documentation showing that to be false.[15]

86.    Upon information and belief, the improper coding was intentional to avoid being unsupported during triple checks and other audit red flags.

87.    Upon information and belief, Good Samaritan knows which fields are audited in a triple check or compliance audit, and Good Samaritan ensures that the answers in those fields do not raise red flags. A complete audit reviews the documentation and assessments to determine support for the answers to the "agreeable to treatment goals" and "able to assist with setting

---

[15] Good Samaritan refuses to provide evaluations or visit notes for Ms. Ancar's clients, even with the release of information signed. If Good Samaritan is performing Electronic Visit Verification ("EVV") then the fraud would likely include Good Samaritan billing for visits not made by patients, which would be evidenced by cross referencing the patients' EVV with that of other providers. This may be a reason that Good Samaritan has discharged all of Ms. Ancar's mutual clients because Ms. Ancar (and patients or families) asked for medical records for the evaluations and visits. For example, Patient A was being seen only once a week for several weeks, and if only one visit a week was being billed on a claim with orders for two to three visits a week, then it would have triggered a discharge. Good Samaritan may be draining the benefit by billing for services right up to the certification period then discharging to stay under the audit radar.

treatment goals. A patient who is not agreeable to treatment goals and is unable to assist in setting treatment goals is not a candidate for therapy services according to Medicare guidelines.

88.    Good Samaritan's misconduct is revealed in part by comparing the codes and documentation used by multiple entities that all bill Medicare for services, DME, and Pharmaceuticals. The coding/records for Patient A, show Good Samaritan manipulated coding or documents. Patient A would have a CPT (service) code for physical and occupational therapy on Patient A's Medicare billing profile due to having received those services. During the same time frame, Patient A also had billing to Part D for Namenda, a medication for moderate to severe Dementia (showing Patient A was not able to retain cues for services so complex as to require a skilled therapist, because ongoing use of Namenda was prescribed by Patient A's doctor and required to treat diagnosis of dementia). Patient A also had Part D billing for Ativan gel twice a day and as needed (showing that anxiety and behaviors required pharmaceutical management to control symptoms well enough to allow activities of daily living). Patient A also had Medicare billing by a durable medical equipment provider for a full mechanical lift (showing that Patient A was non-weight bearing and, therefore, unable to participate in physical therapy). During Patient A's hospitalization and in orthopedic clinic notes, Patient A had ICD-10 coding for non-weight bearing to the right lower extremity due to fall with fracture unrepaired (showing that Patient A could not participate fully in physical therapy) as well as ICD-10 coding for dementia with behavioral disturbances and severe short-term memory loss (showing that Patient A could not remember or retain the cues of the therapist, and that behaviors may interfere with cooperation with a therapist plan of care). Patient A also had ICD-10 codes for life-limiting cardiac conditions and admission and service codes for Hospice (showing that Patient A would not likely be able to benefit from therapy services in a reasonable and meaningful way). All billing codes for

pharmacy, DME, hospital, Hospice, and clinic present a conflict with the admission billing codes and CPT codes for therapy services, showing that the admission to Good Samaritan Home Health services for therapy was not proper and not supported by a complete picture of medical record documentation.

89.     An example of Good Samaritan's manipulation of documentation is when its employees mark down "yes" for agreeable to plan of care, when other documentation shows this statement is inaccurate.  This occurred for Patient A which is described above.

90.     The records for Patient B in April and May of 2024, show Good Samaritan's manipulated coding or documents in order to have Patient B enrolled in Home Health services. Good Samaritan did not code for Patient B's life-limiting condition and overrode the Hospice referral to gain consent to treat for skilled nursing and skilled therapy services.

91.     The conduct that Ms. Ancar observed in the past year is consistent with conduct that Ms. Ancar observed while auditing Good Samaritan locations around the country for many years.  Based on Ms. Ancar's observations during the audits of Good Samaritan locations around the country and based on her years of auditing experience, Ms. Ancar believes that the fraudulent conduct is nationwide and has continued for years.

92.     By manipulation the coding/documents of patients, Good Samaritan violated and continues to violate the False Claims Act, because the services in which Patients were admitted were improper.   Good Samaritan's unlawful admissions tainted all services and care provided to the patients.   By billing and/or receiving money from the United States for providing care to those patients, Good Samaritan has violated the False Claims Act.

**C.     Good Samaritan Fraudulently Extended Admissions of Patients in Home Health to Overbill Medicare**

93.     Since at least 2010, Good Samaritan has been extending patients' admissions in

Home Health beyond the time patients require medically necessitated treatment/care in order to increase Medicare reimbursement amounts, and in order to increase the average length of stay of all Medicare patients as well as to maintain their classification and higher reimbursement level for more days than can be supported by the documentation and status of the patients.

94.     Patients were not discharged properly when the patients reached the established prior level of function.

95.     Patients receiving physical therapy had the services extended until the Medicare benefits were exhausted, then Good Samaritan stopped the services.

96.     Upon information and belief, Good Samaritan was overlooking swallowing problems in order to continue hiding the cognitive decline of patients from the speech therapist who would assess cognition by default in an evaluation. Ignoring Patient A's symptoms including recurring pneumonia and coughing is an example of this practice. This practice by Good Samaritan risks the safety and health of clients in an effort to extend admissions for ongoing Home Health services.

97.     Good Samaritan kept patients in therapy who needed to use mechanical lifts for total assistance with transfers. A patient who uses a mechanical lift should be automatically discharged from therapy. Good Samaritan made a practice of instructing caregivers and families to perform skilled nursing services or violate physician's orders to avoid coding for the change in condition that might lead to early discharge. This occurred for both Patient A and Patient B.

98.     The physician's orders from March 23, 2023, show Good Samaritan's misconduct. The order states that Patient A must be reminded to get up and walk around her house. If a patient requires reminders to walk, then it is not likely that the patient is retaining cues or learning, which would be the benefit required by Medicare to justify and support therapy services. This directive indicates restorative nursing is appropriate and not therapy services paid by Medicare.

99.    The discharge summary for Patient A on June 26, 2023, also shows Good Samaritan's misconduct. Hospice was discussed during this hospitalization. An employee of Good Samaritan told Patient A's daughter that Patient A did not qualify for Hospice because she was on therapy. Ms. Ancar told Patient A's daughter that Hospice was her decision, and that Patient A would have restorative nursing exercises to promote comfort and function at whatever level patient A could do. After discussions with Good Samaritan, Patient A's family elected for Patient A to continue physical therapy.

100.    The conduct that Ms. Ancar observed in the past year is consistent with conduct that Ms. Ancar observed while auditing Good Samaritan locations around the country for many years. Based on Ms. Ancar's observations during the audits of Good Samaritan locations around the country and based on her years of auditing experience, Ms. Ancar believes that the fraudulent conduct is nationwide and has continued for years.

101.    Good Samaritan's improper extension of the admission of patients into its Home Health services constitutes a violation of the False Claims Act. Good Samaritan's unlawful admissions tainted all services and care provided to the patients. By billing and/or receiving money from the United States for providing care to those patients, Good Samaritan has violated the False Claims Act.

\*        \*        \*

102.    In sum, Good Samaritan has defrauded the United States by billing and/or receiving money for healthcare services that were tainted as a result of the above-described schemes. Good Samaritan's fraudulent conduct was material to the United States' payment decision; in other words, had the United States known about the unlawful schemes, it would not have paid Good Samaritan for providing healthcare services to those Medicare beneficiaries.

103.    The damages incurred by the United States as a result of Good Samaritan's fraudulent schemes are substantial.    Because Good Samaritan improperly admitted patients in services that are reimbursed by Medicare described herein, all services and care provided to those patients are tainted and not lawfully payable by the United States.    Therefore, a significant portion of Good Samaritan's Medicare revenue from 2018 to the present is tainted as a result of the illegal schemes.    For reference, Good Samaritan's estimated annual revenue was $1 billion in 2018.[16] Good Samaritan's estimated annual revenue was $1.04 billion in 2022.[17]    Much of this revenue, from 2018 to the present, is at issue in this FCA case.    Upon information and belief, the fraud continues still today—and will no doubt continue to grow in scope as Good Samaritan continues to grow and open more new centers throughout the country.

**COUNT ONE**
**VIOLATION OF THE FALSE CLAIMS ACT**
**31  U.S.C. § 3729(a)(1)(A)**

104.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

105.    As set forth above, since at least 2010, Good Samaritan presented false or fraudulent claims for payment, or knowingly caused false or fraudulent claims for payment to be presented, to officials of the United States' government in violation of 31 U.S.C. § 3729(a)(1)(A). Good Samaritan knowingly and falsely certified that its claims for reimbursement complied with all applicable laws and regulations.

106.    By virtue of the false or fraudulent certifications submitted or caused to be submitted by Defendants, the United States suffered actual damages and therefore is entitled to

---

[16] https://www.good-sam.com/-/media/project/good-sam/about/files/2018-annual-report.pdf / (last visited September 17, 2024).
[17] https://projects.propublica.org/nonprofits/organizations/450228055 (last visited September 17, 2024).

treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT TWO
## VIOLATION OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)

107.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

108.    As set forth above, since at least 2010, Good Samaritan knowingly made, used, or caused to be made or used false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B). Good Samaritan knowingly and falsely certified that its claims for reimbursement complied with all applicable laws and regulations.

109.    By virtue of said conspiracy, the United States suffered actual damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## COUNT THREE
## VIOLATION OF THE FALSE CLAIMS ACT
### U.S.C. § 3729(a)(1)(G)

110.    Relator incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

111.    As set forth above, since at least 2010, Good Samaritan knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

112.    The Affordable Care Act requires a person who has received an overpayment of

Medicare to report and return the overpayment within 60 days of identification or the date of any corresponding cost report is due, and failure to report and return the overpayment is an obligation for purposes of the False Claims Act under 31 U.S.C. § 3729(a)(1)(G). *See* 42 U.S.C. § 1320a-7k(d).

113.    By virtue of Good Samaritan's violations of 31 U.S.C. § 3729(a)(1)(G), the United States suffered actual damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty for each violation.

## PRAYER FOR RELIEF

WHEREFORE, the United States and Relator demand that judgment be entered against Defendants and their owners and in favor of the Relator and the United States as follows:

On Count One through Count Three under the federal False Claims Act (and amended and equivalent state statutes), for the amount of the United States' and States' damages, multiplied by three as required by law, and such civil penalties as are permitted or required by law; the maximum share amount allowed pursuant to 31 U.S.C. § 3730(d) and applicable state laws; all costs and expenses of this action, including attorney fees, expenses and costs as permitted by 31 U.S.C. § 3730(d) and applicable state laws; and all such other relief as may be just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  September 20, 2024

Respectfully submitted,

Michael D. Sharp
THE SHARP FIRM, PROF. LLC
143 N. 3rd Street
Emery, South Dakota 47332
Phone: (605) 550-3000

Email: office@thesharpfirm.com

Joseph M. Callow, Jr.*
Gregory M. Utter*
CALLOW + UTTER LAW GROUP
8044 Montgomery Road, Suite 170
Cincinnati, Ohio 45236
Phone: (513) 378-0141
jcallow@callowandutter.com
gmutter@callowandutter.com

Joel D. Hesch*
THE HESCH FIRM, LLC
3540 Ridgecroft Dr.
Lynchburg, Virginia 24503
Phone:  (434) 229-8677
joel@howtoreportfraud.com

*Attorneys for Relator, Kelly Ancar*
*\* Pro hac vice applications forthcoming*

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| | |
|---|---|
| **I. (a) PLAINTIFFS**<br><br>U.S. ex rel. Kelly Ancar | **DEFENDANTS**<br><br>The Evangelical Lutheran Good Samaritan Society and John Doe Individuals or Entities 1-10 |
| **(b)** County of Residence of First Listed Plaintiff _____<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant ___Minnehaha___<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br><br>See attachment. | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance<br>[ ] 120 Marine<br>[ ] 130 Miller Act<br>[ ] 140 Negotiable Instrument<br>[ ] 150 Recovery of Overpayment & Enforcement of Judgment<br>[ ] 151 Medicare Act<br>[ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>[ ] 153 Recovery of Overpayment of Veteran's Benefits<br>[ ] 160 Stockholders' Suits<br>[ ] 190 Other Contract<br>[ ] 195 Contract Product Liability<br>[ ] 196 Franchise | **PERSONAL INJURY**<br>[ ] 310 Airplane<br>[ ] 315 Airplane Product Liability<br>[ ] 320 Assault, Libel & Slander<br>[ ] 330 Federal Employers' Liability<br>[ ] 340 Marine<br>[ ] 345 Marine Product Liability<br>[ ] 350 Motor Vehicle<br>[ ] 355 Motor Vehicle Product Liability<br>[ ] 360 Other Personal Injury<br>[ ] 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>[ ] 365 Personal Injury - Product Liability<br>[ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>[ ] 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>[ ] 370 Other Fraud<br>[ ] 371 Truth in Lending<br>[ ] 380 Other Personal Property Damage<br>[ ] 385 Property Damage Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881<br>[ ] 690 Other | [ ] 422 Appeal 28 USC 158<br>[ ] 423 Withdrawal 28 USC 157<br>**INTELLECTUAL PROPERTY RIGHTS**<br>[ ] 820 Copyrights<br>[ ] 830 Patent<br>[ ] 835 Patent - Abbreviated New Drug Application<br>[ ] 840 Trademark<br>[ ] 880 Defend Trade Secrets Act of 2016 | [ ] 375 False Claims Act<br>[x] 376 Qui Tam (31 USC 3729(a))<br>[ ] 400 State Reapportionment<br>[ ] 410 Antitrust<br>[ ] 430 Banks and Banking<br>[ ] 450 Commerce<br>[ ] 460 Deportation<br>[ ] 470 Racketeer Influenced and Corrupt Organizations<br>[ ] 480 Consumer Credit (15 USC 1681 or 1692)<br>[ ] 485 Telephone Consumer Protection Act<br>[ ] 490 Cable/Sat TV<br>[ ] 850 Securities/Commodities/ Exchange<br>[ ] 890 Other Statutory Actions<br>[ ] 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | [ ] 893 Environmental Matters<br>[ ] 895 Freedom of Information Act |
| [ ] 210 Land Condemnation<br>[ ] 220 Foreclosure<br>[ ] 230 Rent Lease & Ejectment<br>[ ] 240 Torts to Land<br>[ ] 245 Tort Product Liability<br>[ ] 290 All Other Real Property | [ ] 440 Other Civil Rights<br>[ ] 441 Voting<br>[ ] 442 Employment<br>[ ] 443 Housing/ Accommodations<br>[ ] 445 Amer. w/Disabilities - Employment<br>[ ] 446 Amer. w/Disabilities - Other<br>[ ] 448 Education | **Habeas Corpus:**<br>[ ] 463 Alien Detainee<br>[ ] 510 Motions to Vacate Sentence<br>[ ] 530 General<br>[ ] 535 Death Penalty<br>**Other:**<br>[ ] 540 Mandamus & Other<br>[ ] 550 Civil Rights<br>[ ] 555 Prison Condition<br>[ ] 560 Civil Detainee - Conditions of Confinement | [ ] 710 Fair Labor Standards Act<br>[ ] 720 Labor/Management Relations<br>[ ] 740 Railway Labor Act<br>[ ] 751 Family and Medical Leave Act<br>[ ] 790 Other Labor Litigation<br>[ ] 791 Employee Retirement Income Security Act<br><br>**IMMIGRATION**<br>[ ] 462 Naturalization Application<br>[ ] 465 Other Immigration Actions | [ ] 861 HIA (1395ff)<br>[ ] 862 Black Lung (923)<br>[ ] 863 DIWC/DIWW (405(g))<br>[ ] 864 SSID Title XVI<br>[ ] 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>[ ] 870 Taxes (U.S. Plaintiff or Defendant)<br>[ ] 871 IRS—Third Party 26 USC 7609 | [ ] 896 Arbitration<br>[ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>[ ] 950 Constitutionality of State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. 3729

Brief description of cause:
Fraudulent claims for government reimbursement

## VII. REQUESTED IN COMPLAINT:
- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ Treble Damages

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE
September 20, 2024

SIGNATURE OF ATTORNEY OF RECORD
/s/ Michael D. Sharp

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

Civil Cover Sheet
Plaintiff's Attorneys "Attachment"

Michael D. Sharp
THE SHARP FIRM, PROF. LLC
143 N. 3rd Street
Emery, South Dakota 57332
Phone: (605) 550-3000
Email: office@thesharpfirm.com

Joseph M. Callow, Jr.*
Gregory M. Utter*
CALLOW + UTTER LAW GROUP
8044 Montgomery Road, Suite 170
Cincinnati, Ohio 45236
Phone: (513) 378-0141
jcallow@callowandutter.com
gmutter@callowandutter.com

Joel D. Hesch*
THE HESCH FIRM, LLC
3540 Ridgecroft Dr.
Lynchburg, Virginia 24503
Phone:  (434) 229-8677
joel@howtoreportfraud.com

*Attorneys for Relator, Kelly Ancar*
*\* Pro hac vice applications forthcoming*